# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

**DONNIE R. STEPHENS**                                                         **PLAINTIFF**

v.                                              **CIVIL ACTION NO. 3:16CV-P493-CRS**

**RODNEY BALLARD** *et al.*                                             **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment (DN 43). Plaintiff Donnie R. Stephens, who is proceeding *pro se*, filed a response (DN 53), and Defendants filed a reply (DN 57). For the reasons that follow, the motion will be granted.

## I. SUMMARY OF CLAIMS

Plaintiff, a convicted prisoner at the Kentucky State Reformatory (KSR), filed a 42 U.S.C. § 1983 action on a complaint form (DN 1) and, along therewith, filed a "Memorandum of Facts" (DN 3). Plaintiff alleged an Eighth Amendment claim of deliberate indifference to his safety and security against Kentucky Department of Corrections Commissioner Rodney Ballard, KSR Warden Aaron Smith, and KSR Internal Affairs Captain Mike Williams (DN 1). He sued Defendants in their individual and official capacities and sought monetary and punitive damages; "injunctive relief by issuing injunctions to secure institution"; and an order directing the "Dept of Justice to investigate KSR." *Id.*

In the verified complaint, Plaintiff alleged that on May 6, 2016, "I was assaulted by two inmates due to being labled as a sex-offender – on May 8, 2016 I was assaulted – beaten a 2d time due to being labled a sex-offender. Because a letter was mailed into the institution for a planned hit to be made on me" (DN 1, p. 4). He alleged that following the assault, "I was

detained and placed in segregation, my injuries were reported to KSR Medical staff, with x-rays etc." (DN 3, Mem. of Facts, p. 1). He continued:

> I contacted KSR internal Affairs – I.A. did not responde to my letters – I filed a Grievance it was denied as none Grieable. I went to KSR medical dept due to injuries I got from the assault – I got a concussion – severe headaches blurred vision – I wrote I.A. concerning the hate crime comitted against me due to a letter coming in through the mail room – all mail at this institution is intercepted by internal affairs due to the severe drug and assault problems at KSR[.] I filed a criminal complaint against the conspirators no investigation was taken by I.A. it has been swept under the rugs.
>
> I was assault due to hate crimes and being a sex-offender because this prison is short (150) staff members where over (1800) inmates are housed – no security is present for inmates – assaultive behavior is taken lightly – hate crimes – are rampant – drugs – alcohol – weapons are all over the yard because of a lack of security – The Commissioner – Warden – Internal Affairs are all knowledgable of the incidents and turn blind eyes – The overcrowding is also a major factor – especially with (150) staff members being short – not employed – sex offenders are mixed with (max-custody-assaultive inmates) no measure is taken to secure the yard with officers, to clear weapons and drugs, no officers are placed around the yard to help with security: The matters have been taken to the Commissioner – warden – Internal Affairs—

(DN 1, Compl., pp. 4-5). Plaintiff claimed that "KSR started allowing maximum custody inmates into the medium security prison without a proper assessment of the back grounds of max custody inmates. Therefore allowing increase of assaultive measures to be taken against other inmates" (DN 3, Mem. of Facts, p. 3).

To the complaint, Plaintiff attached a copy of a May 18, 2016, letter he sent to Defendant Williams (DN 1-1, p. 3). In the letter, Plaintiff reported the May 8, 2016, incident that occurred when he was coming out of the chapel. *Id.* He indicated, "I was attacked from behind [], by a black guy that they call Tay Tay. . . . I had a hit put on me by this guy named Paul his nickname in Wolverine up in dorm 1."[1] *Id.* He continues:

---

[1] In his pretrial memorandum, however, Plaintiff indicated, "Inmate *Bobby Hoskins* from dorm 1 approached plaintiff on May 6, 2016 concerning his charges as a sex offender and that he received a letter

2

> "[T]he hit came from the outside and I know who it was, it was over my charges, and it is a hate crime. . . . These guys that did this need to be shipped, because I'm not the only one they have done this to, and they made their threats that their gonna get more people with these charges. They are in a gang, one is called the Flight Team, and the other is called the 246 gang. The Kentucky State Police need to be called in on this matter due to a lack of security to protect all the inmates and staff members as well. This same guy that attacked me also pulled a metal rod out on one of my co-workers brother up in dorm 1. He made a threat to him that he would stab him. I'ts not safe for me to be out on the yard by myself. When I go to work I walk with one of my co-workers. No one on this yard is safe that have a sex charge. . . .

*Id.*

Plaintiff attached another handwritten document describing the May 8, 2016, incident, but the document is not dated and is not directed to anyone (DN 1-1, p. 4). In that document, Plaintiff states that "Paul was paid by a citizen on the street by the name of Malina Bell, who is the one that has custody of my three childred. She put this hit on me b/c of my charge which is a hate crime[.]" *Id.* Relatedly, Plaintiff also attached a Commonwealth of Kentucky Criminal Complaint form, wherein he sought to file charges against Malina Bell (DN 1-1, p. 2). He alleged that Bell had used the U.S. Postal Service to mail a letter to an inmate at KSR to conspire to place a hit on Plaintiff and that "the inmate who placed the hit - assault was related to [Bell]" (DN 1-1, p. 2).

As another attachment to the complaint, Plaintiff provided the grievance referenced in the body of the complaint (DN 1-1, p. 1). The grievance is dated June 16, 2016, and as his statement of the problem, Plaintiff wrote:

> On 5-6-16, I was approached by a guy by the name of Paul in dorm 1. He tried to start a conflict with me due to my charge, b.c there was a letter sumitted to him from the outside to put a hit on me over my charge, and due to a lack of security the letter was not caught by staff members, so on 5-8-16 I was coming out from the chapel on Sunday night and, I was assaulted for the same reason, that is a hate crime. I have written the internal Afairs about

---

from Malina Bell on the streets to have a hit placed on plaintiff for his charges" (DN 40, p. 2) (emphasis added).

> the matter two differant times to find out if they would do something about the situation, but they have not answered me back to let me know anything about the matter. I have been waiting to get a respond from them, but no answer.

*Id.* The grievance was found to be non-grievable because it was against another inmate (DN 1-1, pp. 6-7).

Finally, Plaintiff attached medical records showing that he was diagnosed with a "Post concussion type headache" after his May 2016 altercation(s) (DN 1-1, pp. 8-12).

On initial review of the complaint pursuant to 28 U.S.C. § 1915A (DN 8), the Court allowed Plaintiff's 42 U.S.C. § 1983 Eighth Amendment claim of deliberate indifference to his safety and security to proceed against Defendants Commissioner Ballard, Warden Smith, and Internal Affairs Captain Williams in their official capacities for injunctive relief and in their individual capacities for damages and injunctive relief.

## II. STANDARD

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. DISCUSSION

*A. Damages*

The Eighth Amendment imposes a duty on corrections officers to take reasonable measures "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Rather, to maintain an Eighth Amendment claim based on a failure to prevent harm, an inmate must prove both an objective and subjective component. *Id.* With regard to the objective component, the plaintiff "must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.* The subjective component requires the plaintiff to prove that the defendant acted with "deliberate indifference" to that risk. *Id.* "Deliberate indifference is a state of mind akin to criminal recklessness: the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hamilton v. Eleby*, 341 F. App'x 168, 171 (6th Cir. 2009) (internal quotation marks and citations omitted).

"In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (internal quotation marks and citations omitted). However, actual knowledge also can exist where an inmate presents evidence showing that "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and that the "circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842-43 (internal quotation marks omitted). In these cases,

"it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843; *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) ("[A]wareness can be demonstrated through 'inference from circumstantial evidence,' and a prison official cannot 'escape liability . . . by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.'") (quoting *Farmer*, 511 U.S. at 842-43).

Thus, under this standard, Defendants are only liable if Plaintiff can prove that there was a substantial risk of serious harm to him and that Defendants knew of, and recklessly disregarded, that risk. The Court concludes that Plaintiff cannot make this showing.

Defendants argue that Plaintiff does not demonstrate that any Defendant possessed any information of any threat to him prior to his assault on May 8, 2016, and therefore they were not deliberately indifferent to his safety (DN 43). Defendants assert that, according to the complaint and its attachments, Plaintiff's first attempt to contact Defendant Williams was not until May 18, 2016, by letter, *id.* (citing DN 1-1, letter attached to complaint), and that in the pretrial memorandum, Plaintiff indicated that Defendants Smith and Ballard were made aware of the hits through the grievance process (DN 40, pretrial memorandum).[2] Defendants assert that Plaintiff

---

[2] In support of their motion for summary judgment, Defendants also cite to an "Exhibit 1," but they do not attach that exhibit to their motion. They cite to Exhibit 1 in stating that as a result of the May 8th assault, Plaintiff was moved to the segregation unit pending a decision on whether protective custody was warranted; that the classification committee held a hearing on May 12, 2016, during which time Plaintiff did not identify any witnesses; that the classification committee refused protective custody because Plaintiff could not identify his attacker; and that Plaintiff did not appeal the denial of protective custody. They assert that none of the Defendants were involved in the protective-custody determination in any way. In Plaintiff's response to the motion for summary judgment, Plaintiff admits that he was placed in administrative segregation following the May 8, 2016, attack, but he denies the facts asserted by Defendants regarding the classification hearing as he alleges that there "was never any deanial to appeal the Classification hearing." The Court finds that the information regarding the classification hearing is immaterial to the Eighth Amendment determination in this case. However, both Plaintiff and Defendants agree that Plaintiff was moved to administrative segregation following the May 8, 2016, assault.

fails to offer any direct or circumstantial evidence establishing a question of material fact that would support the allegation that a "'risk of serious harm'" was known to them before Plaintiff was assaulted (DN 57).

In his verified response to the motion for summary judgment, Plaintiff asserts,

> A deliberate indifference was created when plaintiff was a second time assaulted by the same hit squad when internal affairs and staff was made aware of inmates involved, and after the defendants were made aware, they turned blind eyes to the facts and allowed the hit team to roam the yard to continue assaults and robberies, including a second assault on the plaintiff.

(DN 53, p. 4). He additionally asserts, "the defendants also misstate the facts of the case by stating no letter was written to Internal--Affairs Captian Mike Willi[am]s, the plaintiff clearly wrote Mr. Will[ia]ms after the first assault." *Id.*

Plaintiff, however, fails to provide any evidence that he wrote or otherwise notified Defendant Williams or any other Defendant of the first assault and the facts surrounding that assault prior to the second assault. Plaintiff provides the May 18, 2016, letter that he sent to Defendant Williams, which details only the second assault (DN 53-1, p. 18). In the same paragraph in his response as his claim that he "clearly wrote" Defendant Williams after the first assault, Plaintiff states that he "requested Discovery Materiarls from the defendants and received only part of the documents" (DN 53, p. 4). He does not indicate what discovery materials he did not receive or how they would prove his Eighth Amendment claim.

Plaintiff additionally argues that "defendants have proven they cannot provide the reasonable measures to guarantee inmates safety at KSR" (DN 53, p. 2). He first asserts that he was attacked "by an inmate who has been known to assault other inmates and has a name on the KSR yard as a hit team member, especially for sex offenders and weaker inmates." *Id.* at p. 1. Plaintiff provides no evidence showing that Defendants knew before the assaults on Plaintiff that

7

any of the inmates who attacked him were "known to assault other inmates" or had "a name on the yard as a hit team member" or otherwise had a proclivity for violence at KSR or elsewhere.

Further, Plaintiff asserts that "defendants are aware of the hit teams running the KSR yard and there has been numerous other inmates assaulted on th[e] KSR yard, and several other Civil Actions have been filed as result of the assaults." In his response to the motion for summary judgment, Plaintiff does not list any other assaults on the KSR yard. He does, however, cite to *Haley v. Arnold*, Civil Action No. 3:17-CV-P446-DJH. He asserts that "Haley was assaulted by having a Hot Pot full of boiling Baby oil thrown on him by a max custody inmate due to his status as a transgender inmate." Review of the complaint in that case reveals that Haley does not allege that hit teams are running the KSR yard, that the KSR yard is dangerous, that sex offenders or weaker inmates are targeted, that there is understaffing and overcrowding, or any of the other same sweeping allegations raised by Plaintiff. Rather, in his complaint, Haley alleged that he was targeted and assaulted by one inmate from whom KSR officers failed to protect him.[3]

Next, Plaintiff argues that he was assaulted "due to his status as a sex offender and due to the shortage of staff members at [KSR and] the KSR yard is rampant with drug smuggling, alcohol, knives, and the yard has inmate mixed with maximum-medium-close custody levels, inmates who comit crimes on the yard are placed in the segregation unit then released back to the

---

[3] Haley alleged that he was a "30 year old gender nonconforming male that has an extremely feminine appearance housed within the male prison of [KSR]"; that he had been classified as "at risk for sexual assault" due to a prior sexual assault within the prison setting; that his troubles began on May 23, 2016, when another inmate, who was a "sexual predator," tried to have Haley transferred to his cell; that between May 23, 2016 and May 27, 2016, he was threatened and assaulted by this inmate and that several KSR officers knew that this inmate was a danger to Haley but failed to protect Haley from him; and that he was brutally attacked on May 27, 2016, when the other inmate assaulted him with boiling water, beat him unconscious, and broke his jaw bone, while screaming, "If I can't have you, no one will." Civil Action No. 3:17-CV-P446-DJH (DN 1, Compl.).

yard to repeat the same actions." Plaintiff has provided no evidence that KSR was overcrowded. He does attach as an exhibit to his response to the motion for summary judgment a page from the 2016 Annual Report of the Kentucky Department of Corrections indicating understaffing at KSR (DN 53-1, p. 13). That Report indicates:

> In July 2016 the Kentucky Department of Corrections Administration announced due to the Kentucky State Reformatory's severe and continued staffing crisis and with the aging physical facility concerns, that the facility will be downsized. Housing units 4, 5, 6, 8 and 11 along with the Segregation Unit will close and 995 inmates will be moved to contracted prisons and other facilities with the Department of Corrections. The total staff complement for KSR would reduce from 529 to 307.

*Id.* While the report confirms understaffing at KSR, it was published after Plaintiff's assaults, and evidence of understaffing alone does not demonstrate that Defendants knew of any substantial risk of harm to inmates.

In further attempt to prove his Eighth Amendment claim, Plaintiff attaches the affidavits, signed under penalty of perjury, of seven fellow KSR inmates (DN 53-1, pp. 1-12).[4] Four of the inmates indicated that they saw the May 8, 2016, assault at the chapel, and one inmate indicated that he also saw the May 6, 2016, assault. Five of the inmates, generally, without specific details, indicated that there were other assaults around the time period of Plaintiff's assaults.[5]

---

[4] The seven fellow KSR inmates are: Kyle Pierson, Michael Muse, James D. Shelton, James A. Peters, Barry Scott, Larry Stayrook, and Ronn W. Keck.

[5] For instance, one inmate stated, "Sadly, the beating was one of a rash of attacks here at K.S.R. on several inmates at that time/season" (DN 53-1, p. 2); another inmate stated, "I've Been here at KSR scince Oct. 2007 and have witnessed many assaults that were bloody. . . . I too have been harassed due to the nature of my charges but never beaten" (DN 53-1, p. 4); another inmate stated, "Sadly, this was common at K.S.R. Tragically, assaults continue to occur at K.S.R. on a regular basis, punishment remains virtually non-existent, and the staffing issues have not changed" (DN 53-1, p. 7); another inmate stated, "That was the year when we had the most violence on the yard. it was crazy and very dangerous to be on the yard if you had a sex charge" (DN 53-1, p. 9); and yet another inmate stated, "What happened to [Plaintiff] in May of 2016 was not unusual . . . in fact, it is, sadly, the normal way this yard operates every day 24/7/365!" (DN 53-1, p. 12).

Finally, four inmates indicated that officers were not on the yard and that those inmates who attacked other inmates were locked up but then released again.

The inmates' affidavits prove only that Plaintiff was attacked on May 6 and 8, 2016. They, otherwise, are non-specific and fail to demonstrate, when viewed in the light most favorable to Plaintiff, a genuine issue of material fact that there was a substantial risk of serious harm to inmates or sex offenders generally, or to Plaintiff specifically; that the risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past; that any assaults occurred prior to Plaintiff's assaults; or that Defendants had been exposed to any information regarding any risk of harm before Plaintiff's assaults occurred. *See Hester v. Morgan*, 52 F. App'x 220, 223 (6th Cir. 2002) ("Four of these [inmate] affidavits describe a small number of isolated incidents of inmate-on-inmate violence at the prison. The fifth affidavit is from a prisoner who witnessed the attack on Hester. These affidavits do not establish a genuine issue of material fact about the pervasiveness of inmate-on-inmate violence at Turney Center, and none of the incidents is said to have occurred during defendant Morgan's tenure as warden."). "The mere fact that [KSR] housed some violent prisoners or that violence among the inmates would sometimes occur does not establish an Eighth Amendment violation." *Id.*

To his response, Plaintiff also attaches medical records from May and June 2016, which show a diagnosis of a "Post concussion type headache" as a result of the assault(s) against him, and he attaches his June 16, 2016, grievance about the May 6 and 8 assaults (DN 53-1, pp. 18-19). None of these documents prove Defendants' deliberate indifference to his safety.

Finally, the Court also mentions that in Plaintiff's unverified pretrial memorandum, Plaintiff stated, "Warden Smith was made aware of the hits as was Commissioner Ballard

10

through the grievance process" (DN 40, p. 3). Plaintiff, however, indicates that his grievance was ruled non-grievable and fails to show that he ever appealed a grievance regarding the incidents or his fear, and even so, his grievance was filed in June 2016, *after* his attacks. Plaintiff also listed ten "incidents" from August 2016 through March 2017 "[which] have occurred at KSR and can be presented as proof through documentation by KSR Staff."[6] *Id.* at 3-5. Only one of the incidents listed allegedly occurred "due to sex crime"; Plaintiff does not identify his attackers as responsible for any of those incidents; and all the incidents occurred *after* his attacks. Thus, nothing in Plaintiff's pretrial memorandum establishes an issue of material fact about the pervasiveness of assaults at KSR or as to any Defendants' knowledge of any risk of a substantial risk of harm.

For the foregoing reasons, the Court concludes that Plaintiff has not presented evidence that, when viewed in the light most favorable to him, demonstrates that there was a substantial risk of serious harm to inmates generally, or to himself specifically; that the risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past; or that Defendants were aware of the facts from which an inference could be drawn that a substantial risk of serious harm existed and drew such inference.

---

[6] Specifically, Plaintiff listed the following incidents: (1) "August 2016 Tommy Crumb [] was beaten and robbed"; (2) "September 2016 James Riggs was dragged from his cell in form 6 due to sex crime and beaten & fears for his life due to the same inmates being allowed to remain on yard"; (3) "September 2016 Michael Blanding was attacked & beaten by 2 inmates in front of chapel with his neck cut"; (4) "November 15, 2016 c/o Officer Gambriel was assaulted by 2 inmates in form 6"; (5) "December 27, 2016 David Carver [] was killed when he took a nurse hostage"; (6) "January 4, 2017 Inmate Kopech was severly beaten and killed by inmate Fields in Dorm 5 who is still running the yard without charges"; (7) "January 11, 2017 C/O Jones was observed watching as inmate was being killed per statement"; (8) "January 14, 2017 C/O Davis was attacked, and his eyes beaten out of his head by inmate John Jackson"; (9) "March 20, 2017 Inmate Craig Lindsey was beaten severly and assaulted a 2nd time on March 27 2017 by Robby Childs"; and (10) "March 22, 2017 Inmate Aurthur Carter dorm 11, was beaten & robbed" (DN 40, pp. 4-5).

Although the assault on Plaintiff and the injuries he suffered are extremely unfortunate, there is simply no evidence to support Plaintiff's constitutional claim against Defendants. *See Jenkins v. Tenn. Dep't of Corr.*, No. 1:14-0053, 2015 WL 1893378, at *6 (M.D. Tenn. Apr. 27, 2015) ("Although violence among the prison population is an unfortunate reality, not all violence suffered by an inmate at the hands of other inmates is traceable to constitutionally culpable conduct by prison officials or staff.") (citing *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998); *Woods v. Lecureux*, 110 F.3d 1215, 1225 (6th Cir. 1997)). The Court, therefore, will grant summary judgment to Defendants on their claims for damages.

*B. Injunctive Relief*

In addition to damages, Plaintiff requests "injunctive relief by issuing injunctions to secure institution." "[I]nsofar as [an inmate's suit] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct.'" *Farmer*, 511 U.S. at 845 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

> An inmate seeking an injunction on the ground that there is "a contemporary violation of a nature likely to continue" must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction.

*Id.* at 845-46 (internal quotation marks and citations omitted).

> That prison officials' current attitudes and conduct must be assessed in an action for injunctive relief does not mean, of course, that inmates are free to bypass adequate internal prison procedures and bring their health and safety

12

> concerns directly to court. An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity, and any litigant making such an appeal must show that the intervention of equity is required. When a prison inmate seeks injunctive relief, a court need not ignore the inmate's failure to take advantage of adequate prison procedures, and an inmate who needlessly bypasses such procedures may properly be compelled to pursue them. Even apart from the demands of equity, an inmate would be well advised to take advantage of internal prison procedures for resolving inmate grievances.

*Id.* at 847 (internal quotation marks and citations omitted).

Here, the Court concludes that Plaintiff has failed to produce evidence from which it can be inferred that Defendants currently are knowingly and unreasonably disregarding an objectively intolerable risk of harm and that they will continue to do so. The affidavits by fellow inmates that allege a continued problem with understaffing and/or assaults at KSR are not specific in any way.[7] Plaintiff's pretrial memorandum contained a list of assaults that Plaintiff claims occurred through March 2017 (DN 40), and in Plaintiff's motion for partial summary judgment (DN 34), which the Court denied by Memorandum and Order entered February 12, 2018 (DN 46), Plaintiff indicated that an inmate was assaulted on August 8, 2017 (DN 34). Plaintiff has failed to allege, much less provide evidence of, any assaults occurring after that date. He further fails to show that he has filed any grievances since the June 2016 grievance complaining of any failure on the part of any KSR official to protect him from a substantial risk of serious injury or that he has requested protective custody based upon any threat.[8] Therefore,

---

[7] For example, one inmate states, "They were never any staff members out on the yard to keep a look out for these incidents that were happing and there still isn't any on the yard except when they are going and coming to work" (DN 53-1, p. 3); another inmate states, "assaults continue to occur at K.S.R. on a regular basis, punishment remains virtually non-existent, and the staffing issues have not changed" (DN 53-1, p. 7).

[8] Plaintiff previously filed a motion for partial summary judgment (DN 34), which the Court has denied (DN 46). To that motion, Plaintiff attached a declaration dated August 11, 2017, indicating that he is "forced to endure the fear or seek protective custody in a segregated unit without benefits of honor housing, honor status, being allowed to have a prison job, and not being entitled to rehabilitated

the Court also will grant Defendants summary judgment on Plaintiff's claim for injunctive

relief.[9]

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendants' motion for summary judgment (DN 43) is **GRANTED**.

Date: September 27, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**

cc: Plaintiff, *pro se*
Counsel of record
4411.005

---

programming" (DN 34-1, pp. 1-2). Thus, he concedes he has the option of seeking protective custody but apparently does not choose that option.

[9] Moreover, to the extent Plaintiff seeks an order directing the "Dept of Justice to investigate KSR," it is questionable whether the Court even has the authority to direct the executive branch to take such action. *See, e.g.*, *Winding v. Dean*, No. 4:12CV87-DPJ-FKB, 2012 WL 2573250, at *2 (S.D. Miss. July 2, 2012) ("[T]his Court does not have the 'power to compel the executive branch to initiate prosecution.' It follows that the Court does not have the power to compel the executive branch to conduct an investigation.") (internal citation omitted).